**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FAZE CLAN INC.,

                Plaintiff,

     vs.

TURNER TENNEY p/k/a "TFUE"

                Defendant.

Case No. 1:19-cv-07200-JSR

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF**
**<u>PLAINTIFF FAZE CLAN INC. FOR PARTIAL SUMMARY JUDGMENT</u>**

Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020-1089
Telephone: +1 (212) 768-6700

*Attorneys for Defendant FaZe Clan Inc.*

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND .............................................................................................. 3

    A.    FaZe Clan and the Esports Industry ....................................................... 3

    B.    Turner Tenney and the April 27, 2018 Gamer Agreement ...................... 4

    C.    Tenney Disavows the Gamer Agreement, Sets Out to Create a Rival
        Esports Organization and Disparages FaZe Clan .................................... 4

    D.    Tenney Seeks to Evade His Obligations Under the Gamer Agreement by
        Invoking the California Talent Agency Act ............................................ 7

    E.    The California State Court Grants FaZe Clan's Motion to Stay Tenney's
        California Lawsuit ................................................................................. 9

    F.    FaZe Clan Files This Action Against Tenney; Tenney Files Counterclaims ........ 9

III.   ARGUMENT ................................................................................................. 10

    A.    Summary Judgment Standard ............................................................... 10

    B.    The California TAA Does Not Apply to FaZe Clan's Alleged Conduct that
        Occurred Outside of California .............................................................. 10

    C.    Tenney Breached the Gamer Agreement by Not Paying FaZe Clan Its
        Share of "In-Game Merchandise" ......................................................... 13

    D.    Tenney's Counterclaim for Breach of Fiduciary Duty Fails Because Its
        Subject Matter Is Governed by the Gamer Agreement ........................... 16

    E.    Tenney's Claims and Defenses Based on California Business &
        Professions Code Section 16600, *et seq*., Are Meritless ....................... 19

    F.    Tenney's Fraud and Personal Jurisdiction Defenses Fail as Well ........... 21

        1.    Fraud ........................................................................................ 21

        2.    Personal Jurisdiction ................................................................ 22

IV.   CONCLUSION .............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*,
    580 F. Supp. 2d 285 (S.D.N.Y. 2008) ........................................................................18

*Balta v. Ayco Co., LP*,
    626 F. Supp. 2d 347 (W.D.N.Y. 2009) .......................................................................18

*Bernstein v. Virgin Am., Inc.*,
    227 F.Supp.3d 1049 (N.D. Cal. 2017) ..................................................................12, 13

*Brooks v. Key Tr. Co. Nat. Ass'n*,
    809 N.Y.S.2d 270 (3rd Dep't 2006) ...........................................................................16

*Cifarelli v. Vill. of Babylon*,
    93 F.3d 47 (2d Cir. 1996) ...........................................................................................10

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
    70 N.Y.2d 382 (1987) ...........................................................................................17, 18

*Diamond Multimedia Systems, Inc. v. Superior Ct.*,
    19 Cal. 4th 1036 (1999) ..............................................................................................11

*In re Drexel Burnham Lambert Grp., Inc.*,
    160 B.R. 515 (S.D.N.Y. 1993)....................................................................................22

*Erickson Beamon Ltd. v. CMG Worldwide, Inc.*,
    No. 12 CIV. 5105 NRB, 2014 WL 3950897 (S.D.N.Y. Aug. 13, 2014)....................21

*Eslworldwide.com, Inc. v. Interland, Inc.*,
    2006 WL 1716881 (S.D.N.Y. June 21, 2006) ...........................................................22

*Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*,
    552 F. App'x 13 (2d Cir. 2014) ..................................................................................17

*First Investors Corp. v. Liberty Mut. Ins. Co.*,
    152 F.3d 162 (2d Cir.1998)..........................................................................................14

*Gucci Am., Inc. v. Guess?, Inc.*,
    843 F. Supp. 2d 412 (S.D.N.Y. 2012), opinion clarified (Feb. 21, 2012) .................10

*Kaminsky v. FSP Inc.*,
    773 N.Y.S.2d 292 (1st Dep't 2004) .............................................................................18

*Loftus v. John Hancock Mut. Life Ins. Co.*,
    108 F.3d 1370 (2d Cir. 1997) ................................................................................22

*MashreqBank, psc v. ING Grp. N.V.*,
    No. 13 CIV. 2318 LGS, 2013 WL 5780824 (S.D.N.Y. Oct. 25, 2013) ..................17

*Med. Research Assocs., P.C. v. Medcon Fin. Servs., Inc.*,
    253 F. Supp. 2d 643, 649 (S.D.N.Y. 2003) ..........................................................18

*MM Arizona Holdings LLC v. Bonanno*,
    658 F. Supp. 2d 589 (S.D.N.Y. 2009) ............................................................21, 22

*Norwest Mortgage, Inc. v. Superior Ct.*,
    72 Cal. App. 4th 214 (1999) ..................................................................................11

*Olin Corp. v. Lamorak Ins. Co.*,
    332 F. Supp. 3d 818 (S.D.N.Y. 2018) ..................................................................10

*Perkins v. Am. Transit Ins. Co.*,
    No. 10 CIV. 5655 CM, 2013 WL 174426 (S.D.N.Y. Jan. 15, 2013) .....................18

*Radioactive, J.V. v. Manson*,
    153 F. Supp. 2d 462 (S.D.N.Y. 2001) ..................................................................20

*Schron v. Troutman Sanders LLP*,
    20 N.Y. 3d 430 (N.Y. 2013) .................................................................................16

*Sesto v. Slaine*,
    171 F. Supp. 3d 194 (S.D.N.Y. 2016) ..................................................................21

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191 (2011) ..........................................................................11, 12, 13

*Techno Lite, Inc. v. Emcod, LLC*,
    44 Cal. App. 5th 462, 257 Cal. Rptr. 3d 643 (2020) .............................................19

*W.W.W. Associates, Inc. v. Giancontieri*,
    77 N.Y.2d 157 (N.Y. 1990) ...........................................................................15, 16

*Wells Fargo Century, Inc. v. Brown*,
    475 F. Supp. 2d 368 (S.D.N.Y. 2007) ..................................................................22

*Yurman Design, Inc. v. Chaindom Enterprises, Inc.*,
    No. 99 CIV. 9307 (JFK), 2002 WL 31358991 (S.D.N.Y. Sept. 30, 2002) .............21

**Statutes**

California Business and Professions Code
    § 16600.......................................................................................................................3, 19, 20
    §§ 17200 *et seq.* .............................................................................................................11, 19

California Labor Code
    §§ 1700 *et seq.* .................................................................................................................7, 10
    § 1700.4...................................................................................................................................12

**Rules and Regulations**

Federal Rule of Civil Procedure
    Rule 56(a).................................................................................................................................10

Plaintiff FaZe Clan Inc. ("FaZe Clan") respectfully submits this memorandum of law in support of its motion for partial summary judgment or, in the alternative, summary adjudication, against Defendant Turner Tenney ("Tenney").

## I.   <u>INTRODUCTION</u>

In early 2018, Tenney was a promising video game athlete.  He had a budding professional career and a lot of video gaming skill, but his social media following was meager and his efforts had not translated into significant income.  Tenney wanted more.  So, he joined FaZe Clan, signing his Gamer Agreement contract in April of 2018.  FaZe Clan began working with Tenney right away, and almost immediately his social media following began to dramatically grow, as did his income.  But Tenney wanted *even more*.  The rookie contract he had signed with FaZe Clan--which required him to share certain revenue streams with FaZe Clan--no longer suited him, so he began looking for ways out.  Indeed, Tenney freely admitted: "I want to make it very clear that I tried multiple months to get out of this contract."  (*See* Declaration of Manny J. Caixeiro ("Caixeiro Dec."), Ex. I and Ex. A at pp. 173:16-174:6.)

Thus, at the heart of this litigation is the simple fact that Tenney wants to "get out of" the Gamer Agreement so he can keep the enormous benefit he received from FaZe Clan without giving anything to FaZe Clan in return.  In other words, Tenney has accepted the boost to his career that FaZe Clan provided, but now he wants every penny that resulted from it.  As with any agreement, however, FaZe Clan is entitled to the benefit of its bargain under the Gamer Agreement.  Here, that includes receiving its share of certain revenue streams that flowed from Tenney's work.

Relevant to the instant motion, those revenue streams includes the substantial income that is generated when Tenney's and FaZe Clan's fans buy digital enhancements for their Fortnite

characters, including costumes/skins, dances and tools that their digital characters can display or use in gameplay. This is "in game merchandise" and is one of the categories of revenues that Tenney explicitly agreed to share with FaZe Clan. However, Tenney has not shared *any* of this income with FaZe Clan. Tenney is, therefore, in breach of the Gamer Agreement.

In order to achieve Tenney's goal of "getting out" of the Gamer Agreement, he had to devise arguments why he should be permitted to walk away from the contract. So, in 2019, he went on the offensive. For example, Tenney filed lawsuits and administrative proceedings in California even though the Gamer Agreement requires disputes to be litigated in New York. And his lawyer devised an argument that FaZe Clan is violating California's Talent Agency Act (the "California TAA") by supposedly procuring work or engagements for Tenney. Specifically, Tenney has asserted claims and affirmative defenses based on FaZe Clan's supposed violation of California's TAA. Setting aside that Tenney is mischaracterizing FaZe Clan's conduct, for purposes of the instant motion Tenney's claims must fail insofar as the complained of conduct occurred *outside of California*. Indeed, the record shows that FaZe Clan's supposed "procurement" for Tenney occurred *outside of California*, and any alleged "procurement" was for work to be performed *outside of California*. Under such circumstances, Tenney cannot meet his burden to show the California TAA applies; Tenney's California TAA-based claims and defenses, therefore, fail. The Court can and should dismiss these now.

While there are issues in this case that will require trial, there are several other matters that the Court can address on summary judgment. For example, the Court should grant summary judgment on Tenney's claim for breach of fiduciary duty because it is subsumed by the Gamer Agreement and is, in essence, a claim that FaZe Clan breached the contract by allegedly failing to fully perform the Gamer Agreement. Similarly, Tenney's claims and defenses based on

California Business and Professions Code Section 16600 should be dismissed at this stage because, whatever prohibitions that statute may contain against "post-employment" restrictive covenants, it does not prohibit "in term" restrictive covenants of the type at issue here.  Indeed, Tenney's notion that employees should be free to compete against their employers during the term of their employment is not addressed by Section 16600.  The Court should also grant summary judgment on Tenney's claim that the Court lacks personal jurisdiction over him, because he expressly stipulated to personal jurisdiction in New York in the Gamer Agreement.  Finally, Tenney's affirmative defense sounding in "fraud" should be dismissed because it is improperly pled and lacks any supporting evidence.

In sum, FaZe Clan respectfully asks the Court to grant this partial motion for summary judgment, and thereby limit the issues requiring trial in this case.

## II.   **BACKGROUND**

### A.   **FaZe Clan and the Esports Industry**

FaZe Clan is an esports and entertainment organization that competes in video game tournaments and creates social media content.  (Declaration of Erik Anderson ("Anderson Dec.") at ¶ 2; Statement of Undisputed Facts ("SUF") at ¶ 1.)  FaZe Clan has millions of followers on various social media platforms.  (*Id.*)  FaZe Clan was founded around 2010, and it came to prominence as videos of its members playing video games became popular on the internet.  (*Id.* at ¶ 3.)  Presently, FaZe Clan is one of the most popular esports organizations in the world, with a devoted fan base that follows FaZe Clan and its members on social media, watches FaZe Clan's videos and media content, and supports FaZe Clan at esports competitions.  (*Id.*)

FaZe Clan's relationship with its gamers and media personalities is a cornerstone of the organization.  (Anderson Dec. at ¶ 4; SUF ¶ 2.)  While it is true that each gamer's individual

skills are important to FaZe Clan's success, it also is true that FaZe Clan's investment in and support of its gamers are highly important to their success as well.  (*Id.*)  Indeed, FaZe Clan has a track record of creating and/or improving the profile of esports stars and personalities. (*Id.*)

**B.    Turner Tenney and the April 27, 2018 Gamer Agreement**

Defendant and Counterclaimant Turner Tenney is an esports gamer who is especially skilled at playing the game Fortnite.  (Anderson Dec. at ¶ 5; SUF ¶ 3.)  In April of 2018, FaZe Clan invited Tenney to join FaZe Clan and signed Tenney to a "rookie" contract: the April 27, 2018 Gamer Agreement.  (*Id.*)  Under the Gamer Agreement, Tenney agreed to provide professional services to FaZe Clan, including playing on FaZe Clan's team, participating in training activities, and participating in various promotional, marketing and social media activities. (*See* Anderson Dec., Ex. A at pp. 1-2.)  FaZe Clan agreed to pay compensation to Tenney in the form of: (1) a monthly fee, (2) a share of income from cash prizes won at esports tournaments, and (3) a share of revenue from certain merchandise, apparel, brand deals, and other activities.  (*Id.* at 2; SUF ¶ 4.)

The Gamer Agreement is an integrated contract, as evidenced by following sentence from the "Miscellaneous" Section on the contract's fourth page:  "This Agreement, together with the T&Cs and all other exhibits, schedules and attachments referenced herein or therein, contains the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes and cancels all previous negotiations, agreements, commitments, and writings in respect hereto." (Anderson Dec., Ex. A at 4; SUF ¶ 5.)

**C.    Tenney Disavows the Gamer Agreement, Sets Out to Create a Rival Esports
          Organization and Disparages FaZe Clan**

As demonstrated below, Tenney's decision to join FaZe Clan had an immediate and massive impact on his career.  The announcement that Tenney had joined FaZe Clan went out on

April 30, 2018.  The following charts show Tenney's Twitter followers per month before and after that date:





(Declaration of Willis Wiggin ("Wiggin Dec."), Ex. A; SUF ¶ 6.)

Nevertheless, a few months after entering into the Gamer Agreement, Tenney's dissatisfaction with the contract became clear.  (Anderson Dec. at ¶ 7; SUF ¶ 7.)  FaZe Clan valued Tenney's contributions to the organization, so it made numerous proposals to renegotiate

the Gamer Agreement and give Tenney the contractual right to receive more revenue.  (*Id.*)
Tenney rejected all of FaZe Clan's offers.  (*Id.*)

It is now clear that Tenney's true objective has been to get out of the Gamer Agreement
at all costs so that he could start a new esports organization or otherwise compete against  FaZe
Clan – and Tenney's lawsuits and public statements are all in service of that goal.  For example,
Tenney posted a YouTube video on May 22, 2019 with the caption: "I want to make it very clear
that I tried multiple times for multiple months to get out of this contract.  This is what had to be
done."  (*See* Complaint ¶ 32; Answer ¶ 32; Caixeiro Dec. Ex. I and Ex. A at pp. 173:16-174:6;
SUF ¶ 8.)  He signed with talent agency Creative Artists Agency, but terminated their deal when
they were unable to deliver on their promise to get him out of the Gamer Agreement.  (Caixeiro
Dec., Ex. A at pp. 26:5-27:17; 32:17-33:5; SUF ¶ 9.)

Tenney's objectives were further confirmed by press releases.  For example, on May 25,
2019, Forbes reported that, "'Fortnite' Star Tfue Reportedly Starting His Own Team After FaZe
Split."  (Caixeiro Dec., Ex. B; SUF ¶ 10.) The article refers to two sources, including a text
attributed to Tenney's brother, which said:

> Turner [i.e. Tenney] wants to create his own org, work with the
> brands he wants, and overall be free to change the face of gaming
> forever.  Faze refused to allow him to do this.  Turner creating his
> own org is in his best interest.  Emotions and friendship aside, the
> corporate side of faze wouldn't let that happen.  Turner had no
> choice, this was his only option to get out of his contract to make
> his plans and dreams a reality.  Banks might be upset but turner
> doing this is going to help a lot more people that [*sic*] it hurt.

(*Id.*)

Tfue has since launched a clothing line, which competes with FaZe Clan merchandise.
(Caixeiro Dec., Ex. A at 267:17-268:17; SUF ¶ 11.)  And a recent article in the Washington Post

references Tenney's and his families goals of starting a new esports training organization, which

competes with FaZe Clan.  (Caixeiro Dec. Ex. C; SUF ¶ 12.)

> **D.     Tenney Seeks to Evade His Obligations Under the Gamer Agreement by Invoking the California Talent Agency Act**

On May 15, 2019, Tenney commenced an administrative proceeding before the Labor

Commissioner of the State of California.  (Caixeiro Dec., Ex. D; SUF ¶ 13.)  His petition sought

a declaration that the entire Gamer Agreement is unenforceable because FaZe Clan allegedly

provided talent agency services to Tenney without first obtaining a license, purportedly in

violation of the California Talent Agency Act (Cal. Labor Code §§ 1700, *et seq.*) ("California

TAA").  (*Id.*)  Although FaZe Clan's efforts had by this time proven highly lucrative to Tenney,

he sought to "void" the Gamer Agreement to evade his contractual obligations to pay FaZe Clan

the agreed-upon share of the incoming revenue.

On May 20, 2019, Tenney filed a lawsuit against FaZe Clan (*Turner Tenney pka "TFue"*

*v. FaZe Clan Inc.*, No. 19STCV17341, Los Angeles County Superior Court).  (*Id.*, Ex. E; SUF

¶ 14.)  Tenney did so despite the Gamer Agreement's <u>exclusive</u> New York choice of venue

provision.  The California lawsuit also sought a declaration that the entire Gamer Agreement was

void because FaZe Clan had not obtained a license pursuant to the California TAA.  (*Id.* at 5.)

Tenney's state court and administrative filings sought to apply a *California* statute (*i.e.*,

the California TAA) despite a lack of relevant contacts with California.  For example, Tenney

has sought to invoke California law even though he is, and was, a Florida resident.  In fact, when

Tenney entered into the Gamer Agreement, he stated in that Agreement that:  "Gamer means

Turner Tenney … an individual with an address at … Indian Rocks Beach, Florida, 33785".

(Anderson Dec. Ex. A, p. 1; SUF ¶ 15.)  Tenney's December 13, 2019 Answer confirms that he

has remained a Florida resident, as he "admits that he . . . currently resides in Florida."  (Doc. 32, ¶ 12, SUF ¶ 16.)

Moreover, nothing in the Gamer Agreement required Tenney to provide services within California.  (Anderson Dec. at ₱ 6; SUF ¶ 17.)  By the very nature of Tenney's services (*e.g.*, professional video game playing) he was capable of providing those services from any number of locations.  (*Id*.)  Indeed, Tenney provided services under the Gamer Agreement from a variety of locations, including his home in Florida.  (Declaration of Youssef Ali ("Ali Dec.") at ¶ 3; SUF ¶ 18.)  The majority of Tenney's videos and competitive gaming occurred in Florida.  (*Id.*) Tenney did travel to Los Angeles, California, where he visited a FaZe Clan location, but he only stayed for a limited time.  (*Id.* at ¶ 5.)[1]  Tenney never obtained a California driver's license, registered to vote in California, bought or leased real property in California, or took any step that would objectively indicate that he intended to become a permanent resident of California. (*Id.*)

FaZe Clan's performance under the Gamer Agreement also entailed minimal contacts with California.  To justify application of the California TAA, Tenney attempts to seize on the (undisputed) fact that FaZe Clan is headquarted in Los Angeles.  But, like Tenney, much of FaZe Clan's performance under the Gamer Agreement occurred *outside of California*. For example, FaZe Clan sought brand and sponsorhip deals for the organization, in New York and New Jersey. (*See* Wiggin Dec. at ¶¶ 3-5; SUF ¶ 19.)  Tenney contends that FaZe Clan's efforts to obtain these deals for the organization was "procurement" of deals for Tenney, and that such alleged procurement violates the California TAA.

---

[1] In a prior declaration, Tenney asserted that he was in Los Angeles from " approximately the summer of 2018 . . . through the end of December 2018."  (Caixeiro Dec., Ex. F (copy of T. Tenney Oct. 24, 2019 declaration).)  FaZe Clan disputes that Tenney was in Los Angles during that entire period.  However, Tenney's representation does not change the outcome of this motion, as there is no evidence he ever sought to make California his permanent home.

**E.**    **The California State Court Grants FaZe Clan's Motion to Stay Tenney's California Lawsuit**

On August 1, 2019, FaZe Clan filed a motion in the California state court to stay the California action for *forum non conveniens*, based on the Gamer Agreement's exclusive and mandatory New York choice of venue clause.  (Caixeiro Dec. at ¶ 8; SUF ¶ 20.)  After extensive briefing and oral argument, the California State Court granted FaZe Clan's motion to stay, ruling that the Gamer Agreement's choice of venue clause was fully enforceable.  (*Id.* at ¶¶ 8-10 & Ex. G; SUF ¶ 20.) That action remains stayed to this date.

**F.**    **FaZe Clan Files This Action Against Tenney; Tenney Files Counterclaims**

The same day it filed its successful motion to stay in the California court (August 1, 2019), and consistent with the Gamer Agreement's New York choice-of-venue clause, FaZe Clan filed this action against Tenney in this Court.  (Doc. 1; SUF ¶ 21.)  On October 8, 2019 Tenney filed a motion asking this Court to abstain from hearing this action in view of the California litigation, or in the alternative to dismiss the action for lack of personal jurisdiction. (Doc. 18; SUF ¶ 22.)  The Court denied Tenney's motions by order dated October 31, 2019. (Doc. 27; SUF ¶ 22.)

On December 13, 2019, after his abstention and personal jurisdiction motions were denied, Tenney filed his "Amended Answer to Plaintiff's Complaint, With Counterclaims" (Doc. 32; SUF ¶ 23.)  In that filing Tenney again seeks to apply the California TAA, both in the form of counterclaims for declaratory relief (that the Gamer Agreement is purportedly void in its entirety), and as affirmative defenses to FaZe Clan's breach of contract claims.  (Doc. 32 at ¶ 5 and p. 13; *Id.*)

III.   **ARGUMENT**

   A.   **Summary Judgment Standard**

   Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law.  *Olin Corp. v. Lamorak Ins. Co.,* 332 F. Supp. 3d 818, 839

(S.D.N.Y. 2018) (citation omitted) (Rakoff, J.).  A party asserting that a fact cannot be disputed

must support the assertion by either: (A) citing to particular parts of materials in the record ...; or

(B) showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact.  *Id.*

   Once a movant has demonstrated that no material facts are in dispute, the non-movant

must set forth specific facts indicating a genuine issue for trial exists in order to avoid the

granting of summary judgment.  *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)

(citation omitted).  However, "mere conclusory allegations, speculation or conjecture will not

avail a party resisting summary judgment." *Id.*  The non-moving party must do more than show

that there is some metaphysical doubt as to the material facts.  *Gucci Am., Inc. v. Guess?, Inc.*,

843 F. Supp. 2d 412, 417 (S.D.N.Y. 2012), opinion clarified (Feb. 21, 2012) (citation omitted).


   B.   **The California TAA Does Not Apply to FaZe Clan's Alleged Conduct that
        Occurred Outside of California**

   In his counterclaims and affirmative defenses, Tenney impermissibly seeks to apply the

California TAA (Cal. Labor Code §§ 1700, *et seq.*) to conduct that occurred outside of

California's borders.[2]  In construing the geographic reach of the California Labor Code, the California Supreme Court applies the "so-called presumption against extraterritorial application." *Sullivan v. Oracle Corp.,* 51 Cal. 4th 1191, 1207 (2011) (citing *Diamond Multimedia Systems, Inc. v. Superior Ct.*, 19 Cal. 4th 1036, 1059 (1999)).  As the *Sullivan* court explained:  "However far the [California] Legislature's power may theoretically extend," the California Supreme Court "presume[s] the Legislature did not intend a [California] statute to be "'operative, with respect to occurrences outside the state, . . . unless such intention is clearly expressed or reasonably to be inferred "from the language of the act or from its purpose, subject matter or history."'" *Id.* (citations and quotations omitted).

In *Sullivan* the California Supreme Court analyzed the California Unfair Competition Law ("UCL," California Business and Professions Code Sections 17200, *et seq.*), concluding that "[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially."  *Id.* at 1207.  So too, here, Tenney can point to no language in the TAA itself, or its legislative history, from which an extraterritorial application can be "reasonably inferred," much less point to a "clear expression" of extraterritoriality.  As in *Sullivan*, the "presumption against extraterritoriality applies . . . in full force" to the California TAA.  *Id.* (citing *Norwest Mortgage, Inc. v. Superior Ct.*, 72 Cal. App. 4th 214, 222–25 (1999)).

Because the presumption against extraterritorially applies, the California TAA extends only to:

---

[2] The TAA-related claims and defenses to which this argument is directed are:  Tenney's First Counterclaim (Declaratory Relief . . . based on Violations of the TAA) (Doc. 32 at ¶¶ 13-22); Tenney's Second Counterclaim (Violation of the TAA and De Novo Review . . .)(*id.* at ¶¶ 23-26); Tenney's Twenty-Sixth Affirmative Defense (failure to exhaust administrative remedies under the California TAA) (*id.* at p. 13); and Tenney's Twenty-Seventh Affirmative Defense (illegality of the Gamer Agreement under the California TAA) (*id.* at p.13).

(1) "work performed within California's borders" (*Bernstein v. Virgin Am., Inc.*, 227 F. Supp. 3d 1049, 1061 (N.D. Cal. 2017) (citing *Sullivan,* 51 Cal. 4th at 1197-98)); and

(2) "work performed outside of California" <u>if</u> the "wrongful conduct . . . occurs within California." *Id.* at 1062.

In assessing where wrongful conduct "occurs," the test is whether the "last act" giving rise to liability occurred in California. *See Bernstein*, 227 F. Supp. 3d at 1063 ("To determine whether a state law is being applied extraterritorially, courts consider 'whether "the conduct *which gives rise to liability* . . . occurs in California."'" (emphasis in original; quotations omitted). That a company may be headquartered in California, and may have made decisions in the abstract at those California headquarters, is not relevant to the inquiry, as mere decision-making is not itself unlawful. *See Sullivan*, 51 Cal. 4th at 1208 ("Certainly the [California] UCL reaches any unlawful business act or practice committed in California. . . . But for an employer to adopt an erroneous classification policy is not unlawful in the abstract.")

The California TAA makes it unlawful for unlicensed persons to engage in "*procuring, offering, promising, or attempting to procure*" employment or engagements for an artist. *Id.* § 1700.4. These are the "last acts" that give rise to liability for purposes of the extraterritoriality analysis. *See Bernstein*, 227 F.Supp.3d at 1063.

To the extent FaZe Clan "procur[ed]" or "attempt[ed] to procure" any engagements for Tenney (which FaZe Clan denies), the record shows that the complained of conduct occurred predominantly in the New York City area, where FaZe Clan's relevant Account Director (Willis Wiggin) was located. (*See* Wiggin Dec. ¶¶ 4-5; SUF ¶ 19.) As Mr. Wiggin testified at his deposition, it was his "responsibility to sell branded content campaigns and/or sponsorship" engagements "for the FaZe Clan organization." (*Id.*) Mr. Wiggin resided in and frequently met with advertising agencies in the greater New York City area to discuss potential engagements for

FaZe Clan.  (*Id.*)  Despite it being Tenney's burden to prove that the TAA applies and has been

violated, he can point to no evidence that Mr. Wiggin "procured"  or "attempted to procure"

engagements for Tenney *from California* or for him to perform work *within* California -- which

are the relevant questions when it comes to the geographic reach of the California TAA.  *See*

*Bernstein*, 227 F. Supp. 3d at 1061-63; *Sullivan,* 51 Cal. 4th at 1197-98 & 1207.  Thus, Tenney is

seeking to apply the California TAA to conduct occurring (if at all) outside of California, beyond

the statute's territorial reach.  Consequently, FaZe Clan is entitled to summary judgment on the

claims and defenses based on the improper extraterritorial application of California TAA.

## C.     Tenney Breached the Gamer Agreement by Not Paying FaZe Clan Its Share of "In-Game Merchandise"

FaZe Clan's First Cause of Action against Tenney is for Breach of Contract.

Specifically, the Gamer Agreement states that "[a]s full and complete consideration for the

Services to be provided, and all rights granted, by Gamer hereunder, and provided Gamer is not

in breach or default of the terms of this Agreement (including, without limitation, the T&Cs

attached hereto and incorporated by reference herein), Company shall pay Gamer the following

compensation." (Anderson Dec., Ex. A, p. 2; SUF ¶ 24.)  The Gamer agreement then defines

certain income categories including: "[a]ll other income (including, but not limited to, salaries,

earnings, fees, royalties, bonuses, share of profits, and gifts, etc.) generated in connection with

Gamer's Services (whether individually or as part of the Team) from the following sources shall

be split as follows: in-game/sticker ("In-Game Merchandise"): 50% to Gamer and 50% to

Company. (*Id;* SUF ¶ 25.)

The Gamer Agreement specifically defines the term "In-Game Merchandise" as "in-

game/sticker" purchases. (Anderson Dec., Ex. A, p. 2; SUF ¶ 26.)  This language is clearly

defined and unambiguous.  Tenney himself testified that "In-Game Merchandise" was the

13

purchase of  "skins," merchandise, by people using his code, "TFUE" while he was streaming. (Caixeiro Dec., Ex. A, 118:24-119:5; SUF ¶ 27.)  "Skins" are different costumes or figures that the players use when playing the video game.  If the players want to upgrade or have a new costume/figure beyond the default figure, they have to purchase a skin.  Players can then give someone like Tenney, who is part of Epic's creator program, credit for the purchase by imputing that person's creator code, such as "TFUE." Tenney would then receive a percentage of these purchases from Epic. (Caixeiro Dec., Ex. A, 118:24-119:5; 225:4-226:12; SUF ¶ 28.)

To establish a *prima facie* case for breach of contract under New York law, a plaintiff must prove the following elements:  (i) the existence of a contract; (ii) performance of the contract by one party; (iii) breach by the other party; and (iv) damages suffered as a result of the breach.  *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162 (2d Cir.1998).  In the instant motion, Faze Clan asks for a limited ruling: that the undisputed facts prove Tenney breached the Gamer Agreement by withholding the revenue he received in respect of "in-game merchandise."

Under the Gamer Agreement, the parties agreed that Tenney's compensation would include a 50% share of "in-game/sticker ("In-Game Merchandise") generated "in connection with Gamer's Services."  (Anderson Dec., Ex. A at 2; SUF ¶ 25.) The Gamer Services include Tenney's "Play[ing] on [FaZe Clan's Fortnite] Team, which includes participating in tournaments and training sessions with the Team and representing the Team," "Participat[ing] in marketing activities]," and "Participat[ing] in all LAN (Local Area Network) Tournaments, Major Tournaments, League Matches and Online Tournaments as requested by the Company (collectively, "Tournaments and/or Matches") participation in tournaments, participation in marketing activities. (*Id.*; SUF ¶ 30.)  Notably, Tenney admits that "Matches" includes anytime he is streaming online playing against other players.  (Caixeiro Dec., Ex. A at 253:3-21;

14

(Anderson Dec., Ex. A at 2; SUF ¶ 31.)  Thus, the Parties agreed that as part of Tenney's compensation he would receive 50% of in-game merchandise connected to Tenney's esports activities, including playing in tournaments and streaming of matches.

There can be no reasonable dispute that one form of in-game merchandise is the sale of skins, tools, dances and other enhancements for Fortnite characters.  (Caixeiro Dec., Ex. A at 118:24-199:5; SUF ¶ 29.)  When players buy this merchandise from Epic (the creator of Fortnite), they have the option of inserting a code word associated with Tenney, in which case Tenney receives a portion of the sales price for the in-game merchandise.

There is no dispute that Tenney has received income in connection with in-game merchandise from Epic.  (Caixeiro Dec., Ex. A at 201:21-202:7; SUF ¶ 28.)  Nor is there any dispute that Tenney has retained 100% of such revenue for himself, even though the Gamer Agreement clearly provides that he is only entitled to 50% of that revenue.  By failing to remit such revenue to FaZe Clan so that it can take its 50% cut, Tenney has breached the Gamer Agreement.

Unable to seriously dispute that the plain language of the Gamer Agreement entitles FaZe Clan to receive 50% of the in-game merchandise from Epic, Tenney will attempt to inject parol evidence to create confusion about this issue.  Specifically, Tenney may point to social media statements, made around the time the California lawsuit, by gamers and other non-lawyers affiliated with FaZe Clan, to the effect that the Gamer Agreement did not cover in-game merchandise from Epic.  Such statements are irrelevant parol evidence; they have no bearing on the Court's interpretation of unambiguous terms in this integrated contract.

"[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  *W.W.W. Associates, Inc. v. Giancontieri*, 77

N.Y.2d 157, 162 (N.Y. 1990).  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."  *Id.*  This rule has heightened effect where, as here, the contract contains a merger clause.  *Schron v. Troutman Sanders LLP*, 20 N.Y. 3d 430, 436 (N.Y. 2013).  Extrinsic parol evidence is admissible "only if a court finds an ambiguity in the contract"--which "is a question of law to be resolved by the courts."  *Id.*  However, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face."  *W.W.W. Associates*, 77 N.Y. 2d at 163.

Applying these principles, any evidence that Tenney may seek to introduce about FaZe Clan's social media statements is irrelevant.  The Services and Compensation sections of the Gamer Agreement unambiguously require Tenney to share with FaZe Clan 50% of his income from in-game merchandise.  He failed to do so.  As such, he has breached the contract regardless of extrinsic social media statements.

### D.     Tenney's Counterclaim for Breach of Fiduciary Duty Fails Because Its Subject Matter Is Governed by the Gamer Agreement

Tenney's Ninth Counterclaim for breach of fiduciary duty must be dismissed because it merely seeks to enforce alleged contractual duties.  Because the Gamer Agreement governs the parties' relationship, Tenney must put forth facts "apart from the terms of the contract," that create "a relationship of higher trust than would arise from the[] contracts alone so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties."  *Brooks v. Key Tr. Co. Nat. Ass'n*, 809 N.Y.S.2d 270, 272-73 (3rd Dep't 2006) (citation omitted.)  Where the fiduciary duty is "encompassed within the contractual relationship," the terms of the contract control and the fiduciary duty claim must be dismissed.  *Id*. at 272.  As the New York Court of Appeals has explained in the context of a negligence claim,

16

> It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389–90 (1987) (citation omitted) (holding claims for negligent performance of a contract did not support tort claim). Thus, claims for breach of fiduciary duty cannot lie "where there [i]s a formal written agreement covering the precise subject matter of the alleged fiduciary duty." *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 17 (2d Cir. 2014) (citation omitted.) This remains true even in the extreme situation--not presented here--where a party, "by entering into the Agreement . . . undertook to act as an agent and fiduciary." *MashreqBank, psc v. ING Grp. N.V.*, No. 13 CIV. 2318 LGS, 2013 WL 5780824, at *5 (S.D.N.Y. Oct. 25, 2013).

Here, Tenney's fiduciary duty claims are encompassed within and subsumed by the parties' contractual relationship. The services and compensation sections of the Gamer Agreement provide that Tenney would be compensated for "participat[ing] in marketing activities, including for or on behalf of Company, sponsors and brands, as requested by Company from time to time." (Anderson Dec., Ex. A at 2-3; SUF ¶ 32.) As Tenney himself alleges, one of Faze Clan's functions is to promote and sell sponsorship and brand deals. (Doc. 32, ¶ 5 n.2; SUF ¶ 33.) Tenney thereby concedes that the Gamer Agreement governed the parties' obligations vis-à-vis sponsorship and brand deals. Since Tenney's fiduciary duty claims are entirely based on FaZe Clan's alleged actions regarding procurement of the HyperX sponsorship (Doc. 32, ¶ 65; SUF ¶ 34)--actions covered by the Gamer Agreement--"there [i]s a formal written agreement covering the precise subject matter of the alleged fiduciary duty." *Fillmore*, 552 F. App'x at 17 (citation omitted.)

Tenney can put forth no facts showing FaZe clan breached any duty independent of the contract, "spring[ing] from circumstances extraneous to, and not constituting elements of, the contract." *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 389–90.  As in *Clark-Fitzpatrick*, Tenney's claim is essentially one for tortious performance of a contract.  And where, as here, "the alleged breach of fiduciary duty boils down to Defendant's failure to" fulfill its "obligation under the contract," the claim fails.  *Balta v. Ayco Co., LP*, 626 F. Supp. 2d 347, 361 (W.D.N.Y. 2009) (granting defendant summary judgment on breach of fiduciary duty claims because the duties "arose, expressly or impliedly, under the contract, and the parties had no relationship of trust apart from their contractual relationship").[3]

---

[3] *See also Perkins v. Am. Transit Ins. Co.*, No. 10 CIV. 5655 CM, 2013 WL 174426, at *10 (S.D.N.Y. Jan. 15, 2013) (dismissing breach of fiduciary duty claim against insurer where "[p]laintiff has pointed to no evidence in the record from which I could infer that ATIC owed Park some duty above and beyond one arising out of their contractual relationship"); *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008) ("Where a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract."); *Med. Research Assocs., P.C. v. Medcon Fin. Servs., Inc.*, 253 F. Supp. 2d 643, 649 (S.D.N.Y. 2003) (similare); *Kaminsky v. FSP Inc.*, 773 N.Y.S.2d 292, 293 (1st Dep't 2004) (similar).

E.     **Tenney's Claims and Defenses Based on California Business & Professions Code Section 16600, *et seq*., Are Meritless[4]**

The Gamer Agreement imposes certain "in term" and "post term" limitations on Tenney's right to compete with FaZe Clan.  As explained below, these limitations do not violate California Business and Professions Code Section 16600. (Anderson Dec., Ex. A at 8; SUF ¶ 35.)

"In-Term" Limitations.  Section 16600 provide that, with certain exceptions, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (*Id.*)  But, even assuming California law has any applicable here (which FaZe Clan disputes), Section 16600 simply does not apply to "in term" contract restrictive covenants; that is, "the statute does not affect limitations on an employee's conduct or duties *while employed*."  *Techno Lite, Inc. v. Emcod, LLC*, 44 Cal. App. 5th 462, 257 Cal. Rptr. 3d 643, 649-50 (2020) (emphasis in original).

Here, the Gamer Agreement's Terms and Conditions (at Sections 4.c, 5.a, & 5.b) impose certain "in term" restrictions on Tenney, *i.e.*, they apply *only* during the Term (including as applicable the Extended Term) of the Gamer Agreement.  For example, the "Exclusivity Period"

---

[4] Specifically, this argument is directed at:

(1) Tenney's Tenth Affirmative Defense (Answer, at p.10 (alleging that "Gamer Agreement "is void and unenforceable under [Section] 16600 *et seq.*"));

(2) Tenney's Fourth Counterclaim (Answer at ¶¶ 35-43 & Prayer, at p. 35) (seeking a declaration that "Sections 5 and 4.c of the Gamer Agreement are void, illegal and unenforceable" under Section 16600); and

(3) Tenney's Fifth Counterclaim for Unfair Business Practices under California Business and Professions Code, Section 17200 *et seq.* (Answer at ¶¶ 44-49 & Prayer at pp. 35-36 (seeking an order "enjoining FaZe Clan . . . from attempting to enforce Section 5 and the illegal portions of Section 4.c of the Gamer Agreement" because they purportedly constitute a "violation of Section 16600 . . .").

Each of these three counterclaims and defenses is predicated *entirely* on Section 16600, and thus each should be dismissed in their entirety.

under Section 5.a. of the Gamer Agreement lasts during the "Term" of the contract.[5] Thus, even

assuming Tenney was "employed" by FaZe Clan, the in-term limitations (Sections 4.c, 5.a, and

5.b) simply do not violate Section 16600. (Anderson Dec., Ex. A at 8; SUF ¶ 35.)

    <u>Supposed "Post-Term" Limitations.</u>  Section 5.c of the Gamer Agreement's Terms and

Conditions affords FaZe Clan a "Matching Right":  for up to three months *after* the Gamer

Agreement expires, FaZe Clan has the right to match any offer made to Tenney by any other

"Fortnite team." (*Id.*)

    Tenney's assertion that this Matching Offer violates Section 16600 does not present a

justiciable "case or controversy" for three reasons:

- First, it is undisputed that Tenney has never provided such a competing Fortnite offer to FaZe Clan, and thus FaZe Clan's Matching Right has never been triggered.

- Second, even if the Matching Right had been triggered, which it has not, Section 5.c would still be enforceable *outside of California*; *i.e.*, to the extent Tenney, a Florida resident, was "seeking employment outside of California."  *Radioactive, J.V. v. Manson*, 153 F. Supp. 2d 462, 472, fn. 7 (S.D.N.Y. 2001). Tenney makes no such allegation or assertion.

- Third, FaZe Clan has not invoked or sought to invoke the Matching Right provision.

    In short, Tenney's attack on Section 5.c is an improper request for an advisory opinion

regarding a hypothetical that likely will never transpire.

---

[5] Though irrelevant to this motion, the parties dispute whether the "Term" referenced in Section 5.a should be interpreted as including the "Extended Term" of the contract.

**F.      Tenney's Fraud and Personal Jurisdiction Defenses Fail as Well**

*1.      Fraud*

Tenney's third affirmative defense, that "the Gamer Agreement is void for fraud," must be dismissed because it was not properly pled, and in any event, lacks any factual support.  (Doc. 32 at p. 9.)  "Affirmative defenses alleging fraud must be pled with particularity as required by Rule 9(b), or be struck as inadequately pled."  *Sesto v. Slaine*, 171 F. Supp. 3d 194, 205 (S.D.N.Y. 2016); *see also Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12 CIV. 5105 NRB, 2014 WL 3950897, at *5 (S.D.N.Y. Aug. 13, 2014) (citation omitted) ("[D]efendants must plead their affirmative defenses alleging fraud with the particularity required by Fed. R. Civ. P. 9(b).").  Pleading a fraud defense with particularity requires allegations that "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Yurman Design, Inc. v. Chaindom Enterprises, Inc.*, No. 99 CIV. 9307 (JFK), 2002 WL 31358991, at *2–3 (S.D.N.Y. Sept. 30, 2002) (citation omitted).  Tenney plead none of these elements or any specific facts -- the entire affirmative defense is a single conclusory sentence: "Plaintiff's claims are barred, in whole or in part, because the Gamer Agreement is void for fraud." (Doc. 32, p. 9.)

Moreover, even after discovery, Tenney can put forth no facts to support his fraud defense.  Presumably, Tenney is claiming that he was fraudulently induced to enter into the Gamer Agreement, in which case he must show, by clear and convincing evidence, that "(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance."  *MM Arizona Holdings LLC v. Bonanno*, 658 F. Supp. 2d

589, 593 (S.D.N.Y. 2009).  But just like in *Bonanno*, Tenney cannot offer "a scintilla of evidence

to support the claim" that he was fraudulently induced to enter the Gamer Agreement.  *Id*.  "On a

motion for summary judgment, where a party may not rest on conclusions but must offer

evidence to support a claim, this lack of evidence is fatal."  *Id.* at 594 (granting summary

judgment dismissing fraudulent inducement affirmative defense); *see also Loftus v. John

Hancock Mut. Life Ins. Co.*, 108 F.3d 1370 (2d Cir. 1997) (holding appellant's "fraud claim was

properly rejected for lack of any evidence that a fraud had been committed"); *In re Drexel

Burnham Lambert Grp., Inc.*, 160 B.R. 515, 516–17 (S.D.N.Y. 1993) (affirming grant of

summary judgment to debtor when employee had "not presented any admissible evidence that

[debtor] falsely represented to him, or knowingly concealed from him, information concerning

its financial condition").

    *2.*    *Personal Jurisdiction*

Tenney's First Affirmative Defense -- lack of personal jurisdiction -- fails because

Tenney affirmatively consented to jurisdiction in New York.  The Gamer Agreement that Tenney

signed contains the following provision by which Tenney submitted to this Court's jurisdiction:

> The Parties submit exclusively to the state or federal courts located in
> New York, NY for any claim hereunder and each Party consents to the
> jurisdiction thereof.

(Anderson Dec., Ex. A at 4; SUF ¶ 36.)

Tenney acknowledges the existence of the forum selection / consent-to-jurisdiction clause

in the Gamer Agreement, and this clause is presumptively valid and enforceable.  (*Wells Fargo

Century, Inc. v. Brown*, 475 F. Supp. 2d 368, 371 (S.D.N.Y. 2007) (citing *Eslworldwide.com,

Inc. v. Interland, Inc*., 2006 WL 1716881, at *2 (S.D.N.Y. June 21, 2006).)  It is the party

seeking to prevent enforcement -- Tenney -- that "bear[s] the heavy burden of making a 'strong

showing' in order to overcome the presumption of validity."  (*Id.* (clauses should be enforced

"unless it is clearly shown that enforcement would be unreasonable and unjust or that the clause was obtained through fraud or overreaching").)

This is not the first time Tenney has challenged this clause. As the Court may recall, on October 23, 2019 Tenney filed a motion seeking to have this Court abstain from hearing this action under the *Colorado River* doctrine (Doc. 18; SUF ¶ 37), in favor of a separate "pre-emptive" lawsuit that Tenney had filed against FaZe Clan in California state court. As part of that abstention motion, Tenney argued that the California state court would later "determine [whether] the forum selection clause is unenforceable" and in so doing would determine whether "this [federal] Court lacks personal jurisdiction over Tenney." (Doc 18 at p. 19.) This Court denied Tenney's abstention motion on November 6, 2019. (Doc. 27; SUF ¶ 37.) Nevertheless, Tenney pressed forward in the California action and subsequently challenged the enforceability of the venue/jurisdiction clause. That state court briefing was robust and comprehensive, with each side submitting lengthy briefs and numerous declarations. After oral argument, the California trial judge issued a detailed, seven-page, single space ruling, agreeing with FaZe Clan that the venue/jurisdiction clause is *fully enforceable*. (Caixeiro Dec., Ex. G; SUF ¶ 38.) That ruling concluded that Tenney simply had not provided "the type of evidence courts have required to defeat a forum selection clause." (*Id.* at H; SUF ¶ 38.) Tenney's assertion of a personal jurisdiction defense in this Court is a misguided attempt to re-litigate the very jurisdictional question he lost in California state court.

/ / /

/ / /

/ / /

/ / /

## IV.    <u>CONCLUSION</u>

For the reasons stated herein, FaZe Clan respectfully requests that the Court grant summary judgment, or in the alternative summary adjudication, in favor of FaZe Clan as set forth above.


Dated: Los Angeles, California            By: */s/ Manny J. Caixeiro*
      March 5, 2020                         DENTONS US LLP
                                            Joel D. Siegel (admitted *pro hac vice*)
                                              (joel.siegel@dentons.com)
                                            Manny J. Caixeiro (Bar No. MC-0218)
                                                (manny.caixeiro@dentons.com)
                                            Paul M. Kakuske (admitted *pro hac vice*)
                                              (paul.kakuske@dentons.com)
                                            601 South Figueroa Street, Suite 2500
                                          Los Angeles, California 90017-5704
                                          (213) 623-9300

                                          Justin N. Kattan
                                              (justin.kattan@dentons.com)
                                          1221 Avenue of the Americas
                                          New York, New York 10020-1089

                                          *Attorneys for Plaintiff FaZe Clan Inc.*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this case. My business address is Suite 2500, 601 South Figueroa Street, Los Angeles, California 90017-5704.

A true and correct copy of the document, <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFF FAZE CLAN INC. FOR PARTIAL SUMMARY JUDGMENT</u>, was served in the manner stated below.

**1. <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:** Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>March 5, 2020</u>, I checked the CM/ECF docket for this case and determined that the following person/s is/are on the Electronic Mail Notice List to receive NEF transmission at the email address/es stated below.

| | |
|---|---|
| Judd R. Spray | Counsel for Plaintiff |
| Law Office of J.R. Spray | T: 347 409 0211 / F: |
| 450 7th Avenue, 33rd Floor | E: juddspray@juddspraylaw.com |
| New York, NY 10123-3300 | |
| | |
| Joshua D. Liston | Counsel for Defendant |
| Beys Liston & Mobargha LLP | T: 646 755 3600 / F: 646 755 3599 |
| 641 Lexington Avenue, 14th Floor | E: jliston@blmllp.com |
| New York, NY 10022-4503 | |

**2. <u>SERVED BY UNITED STATES MAIL &/~~OR~~ DIRECT EMAIL</u>:** On <u>March 5, 2020</u>, I or an attorney on the matter served the following person/s and/or entity/ies in this case at the last known address/es by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class postage prepaid, and addressed as follows, and/~~or~~ to the email address/es indicated. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

| | |
|---|---|
| Bryan J. Freedman | Counsel for Defendant |
| Freedman & Taitelman, LLP | T: 310 201 0005 / F: 310 201 0045 |
| 1901 Avenue of the Stars, Suite 500 | E: bfreedman@ftllp.com |
| Los Angeles, CA 90067-6007 | |

**3. <u>SERVED BY PERSONAL DELIVERY, NEXT BUSINESS DAY OR FACSIMILE TRANSMISSION</u>:** Pursuant to F.R.Civ.P. 5 and/or controlling Local Rules, on <u>March 5, 2020</u>, the following person/s and/or entity/ies was/were served by personal delivery, overnight mail service, or (for those who consented in writing to such service method) by facsimile transmission. Listing the judge here constitutes a declaration that personal or next court day delivery to the judge <u>will be completed</u> no later than the time indicated, if any.

| | |
|---|---|
| Honorable Jed S. Rakoff | ➲ By Messenger to the Judge's Dropbox w/ NEF behind |
| Daniel Patrick Moynihan U.S. Courthouse |     by 5pm the next court day |
| 500 Pearl Street, Courtroom 14B | ☐ By Next Business Day [Trkg# _____] |
| New York, NY 10007-1312 | ☐ By Facsimile to _____ |
| | ☐ By Email to RakoffNYSDChambers@nysd.uscourts.gov |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 5, 2020 | Frederick Kalve | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

## PROOF OF SERVICE – Case No. 1:19-cv-07200-JSR