**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FAZE CLAN INC.,

                    Plaintiff,

     vs.

TURNER TENNEY p/k/a "TFUE"

                 Defendant.

Case No. 1:19-cv-07200-JSR

**PLAINTIFF FAZE CLAN INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TURNER TENNEY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

[PUBLIC VERSION]

Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020-1089
Telephone: +1 (212) 768-6700

*Attorneys for Defendant FaZe Clan Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.    Tenney Is Not Entitled to Partial Summary Judgment on FaZe Clan's Breach of
Contract Claims ............................................................................................... 3

    A.    FaZe Clan Satisfied Its Obligations under the Gamer Agreement ....................... 3

    B.    Tenney's Invocation of New York General Obligations Law Section 5-903
Is Both Procedurally and Substantively Flawed ........................................ 7

        1.    Tenney Waived This Defense By Not Pleading It ..................................... 7

        2.    In Any Event, Section 5-903 Does Not Apply ........................................ 7

    C.    At a Minimum, There Was an Implied-in-Fact Continuation of the Parties'
Contractual Relationship .......................................................................... 8

II.    Tenney's Request for Summary Judgment on FaZe Clan's Unjust Enrichment
Claim Is Meritless ............................................................................................ 9

    A.    There Are, at Minimum, Triable Issues Concerning Whether Tenney
Unjustly Received Benefits at FaZe Clan's Expense ........................................ 11

    B.    Tenney's Limited Attacks on the Unjust Enrichment Claim Are Meritless ........ 17

III.    There Are Triable Issues of Fact that Preclude Summary Judgment on FaZe
Clan's Tortious Interference Claims ............................................................... 20

CONCLUSION ........................................................................................................... 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................2

*Case v. City of New York*,
   408 F. Supp. 3d 313 (S.D.N.Y. 2019)......................................2

*Choi v. Tower Research Capital LLC*,
   8980 F.3d 50 (2d Cir. 2018).....................................................10

*. Gucci Am., Inc. v. Guess?, Inc.*,
   843 F. Supp. 2d 412 (S.D.N.Y. 2012), op. clarified (Feb. 21, 2012)......................17

*Healthcare I.Q., LLC v. Chao*,
   986 N.Y.S.2d (2014)................................................................7

*Kuklachev v. Gelfman*,
   600 F. Supp. 2d 437 (E.D.N.Y. 2009) ....................................11

*Maison Lazard et Compagnie v. Manfra, Tordella & Brooks, Inc.*,
   585 F. Supp. 1286 (S.D.N.Y. 1984).........................................22

*Marathon Entm't, Inc. v. Blasi*,
   42 Cal. 4th 974 (2008) ............................................18, 19, 20

*Nat'l Football League Properties, Inc. v. Dallas Cowboys Football Club, Ltd.*,
   922 F. Supp. 849 (S.D.N.Y. 1996) ..........................................22

*New York Tel. Co. v. Jamestown Tel. Corp.*,
   282 N.Y. 365 (1940) ................................................................9

*Nickel v. Brenton, LLC*,
   92 F. Supp. 3d 38 (N.D.N.Y. 2015)......................................8, 9

*Oorah, Inc. v. Schick*,
   552 Fed. Appx. 20 (2d Cir. 2014)...........................................10

*Rolin v. Spartan Mullen et Cie., S.A.*,
   No. 10-CV-1586(CM)(FM), 2011 WL 5920931 (S.D.N.Y. Nov. 23, 2011) ...........10

*Sohayegh Enterprises Corp. v. Gisondi*,
   29 N.Y.S.3d 791 (2016)...........................................................8

*Spencer Trask Software and Information Services LLC v. RPost Intern. Ltd.*,
   383 F. Supp. 2d 428 (S.D.N.Y. 2003)......................................................................11

*U.S. v. Nagelberg*,
   772 F. Supp. 120 (E.D.N.Y. 1991) .........................................................................10

*Yoo v. Robi*,
   126 Cal. App. 4th 1089 (2005) ........................................................................19, 20

**Statutes**

Fed. R. Civ. P. 56(a) .....................................................................................................2

New York General Obligations Law § 5-903 ...........................................................7, 8

Plaintiff and counterclaim-defendant FaZe Clan Inc. ("FaZe Clan") respectfully submits this memorandum of law in opposition to the motion for partial summary judgment (the "Motion") of defendant and counter-claimant Turner Tenney ("Tenney").

## INTRODUCTION

Tenney's Motion is based on the misguided belief that he should be allowed to exploit FaZe Clan's brand, reputation, goodwill, people and services to make millions of dollars without having to pay a single nickel to FaZe Clan.  Tenney makes a variety of arguments in service of this belief.  For example, he now belatedly contends -- despite his continued use and exploitation of FaZe Clan and its brand -- that the parties' Gamer Agreement expired on October 27, 2018, because FaZe Clan supposedly failed to make certain $2,000 monthly payments.  In so doing, however, Tenney ignores the facts, including that: (1) he was keeping much more than $2,000 of FaZe Clan's money each month, and (2) prior to October 27, 2018, and continuing into 2020, FaZe Clan made *additional* payments to Tenney in respect of the $2,000.  Tenney has kept all of those payments even while arguing the parties' contract ended in 2018.

Even assuming, for the sake of argument, that the Gamer Agreement did expire in October 2018 (which FaZe Clan denies), this is a textbook case of unjust enrichment.  The undisputed record shows that Tenney readily took the benefits of being associated with FaZe Clan -- and he did so long after October 2018.  Tenney used FaZe Clan's branding well into 2019, generating millions he kept to himself.  Tenney had FaZe Clan members make appearances in his social media to further his revenue streams.  Tenney continued to play, successfully, in tournaments and matches with his FaZe Clan team members.  Tenney accepted FaZe Clan's assistance in the direction of his career.  Tenney enjoyed a dramatic increase in his social media following and his income.  Tenney received and accepted FaZe Clan's money.  And never did he mention to the esports fans that, in his view, he had ceased being affiliated with

FaZe Clan in October 2018. Thus, Tenney exploited FaZe Clan, so equity requires him to give FaZe Clan its share of the revenue.

Tenney's remaining summary judgment arguments must fail because they are based on misstatements of the law and they are replete with issues of fact, as discussed in greater detail below. Accordingly, the Court should deny Tenney's Motion in its entirety.[1]

## **ARGUMENT**

Tenney is only entitled to summary judgment if the record shows there is no genuine dispute about any material fact. Fed. R. Civ. P. 56(a). If "the evidence is such that a reasonable jury could return a verdict for" FaZe Clan, Tenney's motion should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Tenney, as moving party, "bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record." *Case v. City of New York*, 408 F. Supp. 3d 313, 320 (S.D.N.Y. 2019). Even on issues where FaZe Clan "has the ultimate burden of proof on specific issues at trial," Tenney must nevertheless "satisfy [his] own summary-judgment burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact" -- and only then will the burden of proof shift back to FaZe Clan. *Id.*

---

[1] After the filing of their respective summary judgment motions, the parties stipulated to the dismissal of certain claims, counterclaims and defenses. (*See* Declaration of Manny J. Caixeiro in Support of FaZe Clan's Opposition to Turner Tenney's Partial Motion for Summary Judgment "Caixeiro Opp. Dec.," Ex. G.) As part of this stipulation, FaZe Clan has stipulated to the dismissal of its Fifth Cause of Action (Misappropriation of Trade Secrets), Sixth Cause of Action (Intentional Interference with Contract, solely to the extent it alleges interference with FaZe Clan's contracts with other gamers and media personalities, but not to the extent it alleges interference with FaZe Clan's brand deals/sponsors) and Eighth Cause of Action (Commercial Disparagement). Accordingly, the Court need not consider Sections III. IV.A, and VI. of the Motion, as those sections have been rendered moot.

I.     **Tenney Is Not Entitled to Partial Summary Judgment on FaZe Clan's Breach of Contract Claims**

A.     **FaZe Clan Satisfied Its Obligations under the Gamer Agreement**

As a preliminary matter, FaZe Clan's breach of contract claims (First, Second, and Third Causes of Action) necessarily survive Tenney's Motion, because that motion does not challenge the contract claims *prior to the automatic renewal of the Gamer Agreement* (April 27, 2018 to October 27, 2018).  Tenney's Motion seeks *only* a ruling that the Gamer Agreement was not extended to include the period between October 2018 and October 2021.  (*See* Tenney's Memo. of Law in Support of Df.'s Motion for Partial Summary Judgment (Dkt. 48) ("Tenney MSJ") § II, at pp. 4-8.)  FaZe Clan's claims for breaches of contract prior to October 27, 2018 are not at issue in Tenney's Motion.

Tenney argues in his Motion that FaZe Clan did not timely make Monthly Fee payments under the Gamer Agreement, therefore the contract did not continue past October of 2018. (Tenney MSJ at 5-7.)  However, as discussed in further detail below, Tenney ignores that, not only did FaZe Clan make all of the $2,000 payments Tenney claims he is owed, but FaZe Clan further satisfied its payment obligation each month when Tenney received--and kept--far in excess of $2,000 of FaZe Clan's money each month.  Thus, Tenney's argument is cynical and baseless.

Under the Gamer Agreement, Tenney was to provide "Gamer Services" in exchange for certain compensation from FaZe Clan.  (Affidavit of Turner Tenney [ECF No. 51] ("Tenney Aff."), Ex. 1 at 1-2.)  The revenue from those services was to flow directly to FaZe Clan, and to the extent Tenney directly received such revenue he was required to turn it over to FaZe Clan. (*Id.*; *see also* p. 3 ("In the event that any person or entity pays any income directly to Gamer, Gamer agrees that he/she shall promptly transfer all such income to Company for collection and

accounting."))  For his part, Tenney was to receive certain Compensation from FaZe Clan, including a $2,000 "Monthly Fee," (Tenney Aff. Ex. 1 at 2), which was "payable on the 30th of each month during the Term for the Services provided during the prior month (*id*. at 3.)  The Gamer Agreement does not specify the form the Monthly Fee must take (*e.g*., a check, a direct deposit, etc.).  Tenney would also receive from FaZe Clan his agreed upon percentage of certain revenue streams.

Setting aside, momentarily, that FaZe Clan made all of the $2,000 payments Tenney was owed as of October 27, 2017, it is important to understand that Tenney was separately self-collecting the $2,000.  Tenney did not comply with his obligation to remit to FaZe Clan the money he received; rather, he directly received and retained all money generated by Gamer Services without ever turning them over to FaZe Clan for an accounting.  (FaZe Clan's Response to Defendant's Rule 56.1 Statement of Undisputed Fact ("SUF Response") ¶ 35; Caixeiro Opp. Dec., Ex. A at 232:20-233:11.)  Even factoring in the amounts Tenney would have received back from FaZe Clan had he complied with his obligation to remit payment to FaZe Clan, the amounts he received and held each month were far in excess of $2,000.  Indeed, third-parties deposited over $███████ directly into Tenney's checking account during the first six months of the Gamer Agreement, all of which Tenney has kept to himself.  (SUF Response ¶ 36; Declaration of Lee Trink in Support of FaZe Clan Inc.'s Opposition to Tenney's Motion for Partial Summary Judgment "Trink Dec." ¶ 6; Caixeiro Opp. Dec., Ex. C.) Assuming, *arguendo*, that Tenney was entitled under the Gamer Agreement to retain 80% of all moneys (which is not the case),[2] Tenney's retention of the other 20% meant that he was receiving and holding no less than

---

[2] 80% represents the highest percentage split that Tenney was entitled to receive for a particular revenue stream under the Gamer Agreement.   Tenney Dec. Ex. 1 at 2-3.  This brief uses the 80% figure to illustrate a point, because it is the most punitive to FaZe Clan.  In reality, the percentage Tenney was entitled to receive was far lower than 80% for most revenue streams.

$█████ of FaZe Clan's money during that initial six month term (20% of $█████).[3] (*Id.*)

Tenney intermingled these funds with other funds in his bank account, and was more than

capable of allocating $2,000 per month to the Monthly Payment.  (SUF Response ¶ 37; Caixeiro

Opp. Dec., Ex. A at pp. 111:16-112:12.)  Each time Tenney kept $2,000 of income due to FaZe

Clan he effectively received the "Monthly Payment" from FaZe Clan. (SUF Response ¶ 35; 37.)

While Tenney *now* claims he is entitled to "get out" of the Gamer Agreement because of

the purportedly "untimely" $2,000 per month payments, this a position his attorneys have

invented during the course of this litigation.  For example, in an effort to show that FaZe Clan

was supposedly aware of Tenney's position concerning the Monthly Fee, Tenney cites to a

September 26, 2018 letter from his attorney (David Phillips, Esq.).  (SUF Response ¶ 39; Tenney

MSJ at 5 (citing SUF ¶ 6); Turner Aff. at ¶ 3.) Yet, the referenced letter from attorney Phillips

makes no reference whatsoever to any "untimely" $2,000 per month payments.[4]  (*Id.*)  Notably,

even if Phillips' letter had asserted a breach based on the Monthly Fee payments (which it did

not), the only effect would have been to give FaZe Clan a 30-day cure period.  *See* Tenney Dec.,

Ex. 1, Terms and Conditions at 6(d).

FaZe Clan's counsel responded on October 15, 2018, explaining that Phillips' letter "fails

to indicate any detail or even the nature of any supposed breach," and that the letter was similarly

"unfounded" as to the vague accusation that an unidentified "condition" to the contract's

continuation had not been met.  (SUF Response ¶ 40; Declaration of Lee Trink in Support of

FaZe Clan Inc.'s Opposition to Tenney's Motion for Partial Summary Judgment ("Trink Dec.")

at Ex. A.)  Even on May 20, 2019, when Tenney commenced litigation against FaZe Clan in

---

[3] The parties dispute the proper allocations for some revenue categories.
[4] Even if Phillips' letter had mentioned the monthly payments, it would only have triggered a 30-day cure period

5

California, his attorney sent a letter accusing FaZe Clan of vague "material breaches" of the Gamer Agreement -- but the letter made no mention of untimely payments of the Monthly Fee. (SUF Response ¶ 41; Trink Dec., Ex. B.)  And while the complaint Tenney filed in California on May 20, 2019 included a cause of action for breach of the Gamer Agreement, it did not mention any "untimely" "$2,000 per month" payments. (SUF Response ¶ 42; *see generally* Declaration of Manny J. Caixeiro in Support of FaZe Clan Inc.'s Motion for Partial Summary Judgment, filed March 5, 2020, Dkt. 47-4 at Exhibit E.)

In any case, to avoid any uncertainty, beginning in October 2018 and *continuing into 2020*, FaZe Clan has made the additional $2,000 per month payments to Tenney -- even while he continues to hold millions of dollars in FaZe Clan's money.  (SUF Response ¶ 38; *see* Trink Dec. ¶ 6, Exh. C (record for October 15, 2018 payment of 10,000 to Tenney); Exh. D (record for January 21, 2020 payment of $2,000 to Tenney.)  Indeed, prior to October 27, 2018, FaZe Clan deposited $10,000 into Tenney's accounts (an amount equal to $2,000 payments for May through September of 2018).  (SUF Response ¶ 38; Trink Dec. ¶ 6, Exh. C.)  Since that time, FaZe Clan has continued to pay -- *and Tenney has continued to accept* -- such payments.  (SUF Response ¶ 38; Trink Dec. ¶ 6, Exh. D.)  Thus, Tenney has no legitimate grievance about the Monthly Fee, and his argument is properly viewed in the context of his unyielding efforts to "get out of" the Gamer Agreement; this is the latest excuse he is conveniently relying upon.  (SUF Response ¶ 43; *see* Caixeiro Opp. Dec., Ex. B ("I want to make it very clear that I tried multiple times for multiple months to get out of this contract.  This is what had to be done.")  At best, it is an argument replete with disputed issues of fact, and disputed credibility to be resolved by the jury; it is not suitable for resolution on summary judgment.

**B.      Tenney's Invocation of New York General Obligations Law Section 5-903 Is Both Procedurally and Substantively Flawed**

**1.      Tenney Waived This Defense By Not Pleading It**

Section 5-903 places limitations on the enforceability of certain  contract clauses.  N.Y. Gen. Oblig. Law § 5-903.  (*See* Tenney MSJ at 7-8.)  Importantly, a defense based on § 5-903 is waived if not pled in the answer.  *See Healthcare I.Q., LLC v. Chao*, 986 N.Y.S.2d (2014) (denying defendant's motion for summary judgment because he "did not assert General Obligations Law § 5-903 as an affirmative defense in his original answer . . ."; it was "an unpled defense and was, therefore, waived.").  Tenney did not plead this defense in his December 13, 2019 Amended Answer (Dkt. 32).  Therefore, he waived the defense and it can be a basis for summary judgment.

**2.      In Any Event, Section 5-903 Does Not Apply**

Even if Tenney had not waived the defense, the statute does not apply to the Gamer Agreement.  By its own terms, Section 5-903 applies to a limited universe of contracts.  Specifically, it applies only to a contract:

> "which states that the term of the contract shall be deemed renewed for a specified additional period unless the person receiving the service, maintenance or repair <u>gives notice</u> to the person furnishing such contract service, maintenance or repair <u>of his intention to terminate</u> the contract <u>at the expiration of such term</u> . . . "

N.Y. Gen. Oblig. Law § 5-903.  The Gamer Agreement states nothing of the sort.  It does not provide Tenney with any right to terminate the Agreement "at the expiration of the [six-month] term," much less does it require Tenney to give "notice" to FaZe Clan of such a (non-existent) termination right.  Indeed, Tenney's only termination right exists in the event of FaZe Clan's

material breach; it is untethered to the extension clause.[5]  (Tenney Aff., Ex. 1 at ¶ 6.d, "Each party shall have the right to terminate the Agreement if the other party commits a material breach of its representations, warranties, covenants or other obligations hereunder.")  Such a provision is outside the ambit of § 5-903.  *See*, *e.g.*, *Sohayegh Enterprises Corp. v. Gisondi*, 29 N.Y.S.3d 791 (2016) (brokerage agreement that automatically "extended" if certain real property "was under contract" did not fall within the scope of section 5–903).

### C.     At a Minimum, There Was an Implied-in-Fact Continuation of the Parties' Contractual Relationship

The parties' conduct after October 27, 2018, at which time they continued to act and perform as if the Gamer Agreement was still in full force and Tenney continued to accept and receive FaZe Clan's money, creates a triable issue of fact as to whether an "implied-in-fact" contract existed between Tenney and FaZe Clan for that post-October 2018 period.

"Under New York Law, 'the parties' conduct after the expiration of [a] written contract, including [one party's] continued rendition of services, [the other's] acceptance of those services and . . . payment . . . in accordance with the terms of the written contract' can establish 'a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract.'"  *Nickel v. Brenton, LLC*, 92 F. Supp. 3d 38, 45 (N.D.N.Y. 2015) (quoting *Andrews v. Sotheby Intern. Realty, Inc.*, 2014 WL 626968, *8 (S.D.N.Y. Feb. 18, 2014)).  Whether there was a meeting of the minds to continue on such terms presents questions of fact.  *See id.* (denying the defendant's summary judgment motion because of disputed issues

---

[5] Notably, assuming, *arguendo*, FaZe Clan had committed a material breach (which FaZe Clan denies), Tenney could not have terminated the Gamer Agreement without giving FaZe Clan 30 days to cure the breach.  (Tenney Aff., Ex. 1 at ¶ 6.d.)  Thus, even if Mr. Phillips' September 26, 2018 letter could be deemed sufficient notice of breach (which FaZe Clan denies), it cured any supposed breach by making the $10,000 payment to Tenney on October 15.  Thus, Tenney had no right to terminate the Gamer Agreement.

of fact regarding the degree to which "Plaintiff . . . continued to act as Defendant's . . . representative in a similar fashion regarding the services [plaintiff] had provided to [defendant] under their original written Agreement").  For purposes of this analysis, there is "[n]o distinction, in principle, . . . between a contract which, according to its terms, expires on a date fixed by the parties at the time the contract is made and a contract which expires at a date fixed thereafter by [termination] notice given in accordance with the terms of the contract."  *New York Tel. Co. v. Jamestown Tel. Corp.*, 282 N.Y. 365, 371-72 (1940).  Thus, even a written notice of termination can be "rendered ineffective by subsequent acts or words of the parties," as when the terminating party continues to "receive benefits derived from the contract."  *Id*. at 372.

As discussed in greater detail in Section II.A, below, concerning FaZe Clan's Unjust Enrichment claim, there is no question that, after October 27, 2018, Tenney continued to conduct himself as if the Gamer Agreement was still in full force and effect.  He continued to compete on FaZe Clan's Fortnite team, traveled with his FaZe Clan manager to tournaments, displayed the FaZe Clan logo to monetize his live-streamed gaming sessions on YouTube and Twitch, received Monthly Fees from FaZe Clan, and otherwise held himself out as associated with FaZe Clan. (*See infra*, Section II.A.)  And FaZe Clan continued to promote Tenney and allow him to associate himself with FaZe Clan's brand and gamers.  Thus, at minimum, there is a triable issue as to whether there was an implied-in-fact extension of the Gamer Agreement.  *See Nickel*, 92 F. Supp. 3d at 45-47.

## II.   Tenney's Request for Summary Judgment on FaZe Clan's Unjust Enrichment Claim Is Meritless

Assuming, *arguendo*, the Gamer Agreement did expire in October 27, 2018, the undisputed facts show that Tenney continued to hold himself out to the world as a member of FaZe Clan, while using FaZe Clan's branding, resources, personnel and services to enhance his

popularity and generate income.  And, in any event, Tenney indisputably has accepted the valuable benefits of being associated with FaZe Clan since April of 2018.  Tenney's position is that he is entitled to reap these benefits without allowing FaZe Clan to receive its share; indeed, as a factual matter, Tenney appears to believe that he should be allowed to exploit FaZe Clan to generate millions of dollars without providing a nickel to FaZe Clan.  Such an outcome would be inequitable.

The Unjust Enrichment cause of action exists to prevent the inequitable outcome that Tenney advocates; it allows a plaintiff to recover in quasi-contract when there is a showing "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Choi v. Tower Research Capital LLC*, 8980 F.3d 50, 69 (2d Cir. 2018).  The "essence" of the claim is that the defendant has received money or a benefit at the plaintiff's expense.  *Rolin v. Spartan Mullen et Cie., S.A.*, No. 10-CV-1586(CM)(FM), 2011 WL 5920931, *11 (S.D.N.Y. Nov. 23, 2011).  In adjudicating an unjust enrichment claim, "[a] court must make its determination based on legal inference drawn from circumstantial evidence, applying principles of equity."  *U.S. v. Nagelberg*, 772 F. Supp. 120, 122 (E.D.N.Y. 1991).  Notably, unjust enrichment can occur even in the extreme case -- not presented here -- where the defendant has not committed any wrongful action; the critical question is whether the defendant is in possession of property or funds that, in equity and good conscience, should belong to the plaintiff.  *Nagelberg*, 772 F. Supp. at 123.

Courts in the Second Circuit have approved unjust enrichment claims in similar circumstances, where a defendant seeks to exploit its relationship with the plaintiff -- and the plaintiff's reputation and goodwill -- without compensating the plaintiff.  *See Oorah, Inc. v. Schick*, 552 Fed. Appx. 20, 23-24 (2d Cir. 2014) (affirming judgment on unjust enrichment claim

where counterclaim-defendant "publicized its philanthropic relationship with [counterclaim-plaintiff] to further its own development goals, yet [counterclaim-plaintiff] [was] burdened with covering the entire cost . . . "); *Spencer Trask Software and Information Services LLC v. RPost Intern. Ltd.*, 383 F. Supp. 2d 428, 448-449 (S.D.N.Y. 2003) (unjust enrichment could go forward based on defendants' retention of investment and value of plaintiff's reputation and good name as an investor, without honoring contested agreement); *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 477 (E.D.N.Y. 2009) (sustaining unjust enrichment claim based on allegations that defendants appropriated plaintiffs' personal, goodwill and reputation to sell tickets and merchandise to audience, on basis of "representation that plaintiffs were somehow involved in the performances").

### A.   There Are, at Minimum, Triable Issues Concerning Whether Tenney Unjustly Received Benefits at FaZe Clan's Expense

Here, the undisputed facts overwhelmingly demonstrate -- and at minimum create triable issues of fact -- that Tenney has been unjustly enriched at FaZe Clan's expense.  From the time Tenney signed with FaZe Clan -- *and continuing well beyond October 2018, when Tenney claims the Gamer Agreement expired* -- Tenney readily accepted the benefits of his association with FaZe Clan.  Among other things:

- Members of FaZe Clan's Fortnite team played as teammates with Tenney, including in tournaments and matches (SUF Response ¶ 44; Trink Dec. ¶ 7a.);

- FaZe Clan promoted Tenney, including by having its gamers and content creators drive attention to Tenney's social media through a campaign of "likes," "follows," "subscriptions" and other references (SUF Response ¶ 44; Trink Dec. ¶ 7b.);

- FaZe Clan publicized Tenney's esports victories, including through promotional videos, which helped Tenney to become more popular and earn more money (SUF Response ¶ 44; Trink Dec. ¶ 7c, Ex. E.);

- Tenney regularly displayed FaZe Clan branding in social media and streaming (SUF Response ¶ 44; Trink Dec. ¶ 7e, Caixeiro Opp. Dec., Ex. A at 115:8-116:2; Ex. D);

- FaZe Clan gamers and content creators appeared in Tenney's videos, which further drove attention to Tenney (SUF Response ¶ 44; Trink Dec. ¶ 7d; Declaration of Richard Bengtson in Support of FaZe Clan Inc.'s Opposition to Tenney's Motion for Partial Summary Judgment ("Bengtson Dec.") ¶ 3, Ex. A);

- FaZe Clan personnel took Tenney under their wing, teaching him techniques for making better and more entertaining streams and videos that would draw a bigger audience to the FaZe Clan brand (SUF Response ¶ 44; Trink Dec. ¶ 7f; Bengtson Dec. ¶ 3);

- FaZe Clan personnel helped Tenney to manage his social media strategies so his use of various platforms was integrated, cohesive, and had maximum synergies (SUF Response ¶ 44; Trink Dec. ¶ 7f-g; Bengtson Dec. ¶ 3);

- FaZe Clan provided management services for Tenney, which included traveling domestically and internationally with Tenney, coordinating his travel plans, supporting his streaming efforts; and personal arrangements for Tenney (SUF Response ¶ 44; Trink Dec. ¶ 7h; Caixeiro Opp. Dec., Ex. F at 47:8-18; 23:7-22);

- FaZe Clan personnel promoted Tenney's Epic Games creator code, including in a February 2019 video in which Richard Bengtson (FaZe Banks) allowed Tenney to tattoo "CODE TFUE" on Banks' leg  (SUF Response ¶ 44; Trink Dec. ¶ 7i; Bengtson Dec. ¶ 3, Exh. A);

- FaZe Clan paid, well beyond October 2018, amounts to Tenney equal to the Monthly Payment (SUF Response ¶ 44; Trink Dec. ¶ ¶ 7j); and

- Tenney continued to collect, and retain, money from streaming, merchandise, in game merchandise, tournaments, and other activities that FaZe Clan was entitled to share with Tenney (SUF Response ¶ 44; Trink Dec. ₱ 7k; Caixeiro Opp. Dec., Ex. A at 232:20-233:11).

While Tenney now claims that his relationship with FaZe Clan ended in October 2018, he conceded at his deposition that he never publicly revealed that position -- or otherwise depicted himself as disassociated from FaZe Clan -- at the time:

> Q.      . . . And at any point in time prior to April 1, 2019, did you announce to your subscribers, your followers that you were no longer affiliated with FaZe Clan?
> A.      No.
>                                                 . . .
> Q.  When did you first announce to the world that you were no longer affiliated with FaZe?
> . . .
> A.      I don't think -- I don't think I made an announcement at all."

(SUF Response ¶ 45; Caixeiro Opp. Dec., Ex. A at pp. 117:23-118:3; 138:17-25.)

There can be no legitimate dispute that the benefits Tenney received were valuable, and were at FaZe Clan's expense.  From the moment Tenney signed with FaZe Clan, his social media presence skyrocketed.  This trend continued well beyond October 2018, as the tables below illustrate:





(SUF Response ¶ 46; Caixeiro Opp. Dec., Ex H.)

     Tenney's income similarly experienced exponential growth once he became affiliated with FaZe Clan, as illustrated by the banking records produced by Tenney for deposits relating to the Gamer Agreement.  (SUF Response ¶ 47; Caixeiro Opp. Dec., Ex. C.) For example, from mid-June through July 2018 (the first period for which Tenney provided any revenue information), he received under $██████.  (*Id.*) Focusing on Twitch, he received a total

approximately $██████ during this period.  In stark comparison, due to benefits Tenney was taking from FaZe Clan, during the period of September 14 through October 31, 2018, Tenney received over $██████, and the revenue from Twitch had increased to over $██████.  (*Id.*) These amounts continued to increase dramatically.  (*Id.*)  In February 2019 Tenney received over $████████, in March 2019 he received over $████████, and in April 2019 he received over $██████.  (*Id.*)

Tenney continued exploiting FaZe Clan, and continued accepting the benefits of his association with FaZe Clan, well after October 27, 2018.  FaZe Clan continued to promote Tenney, appear in Tenney's videos, and compete with Tenney in tournaments and matches until well into 2019.  (SUF Response ¶ 49.)  FaZe Clan has continued to make $2,000 monthly payments into 2020.  (*Id.*)

To illustrate just how disingenuous it is for Tenney to claim that his relationship with FaZe Clan ended in October 2018, one need only consider how Tenney continued to use FaZe Clan branding to generate revenue through at least April, 2019 -- less than a month before commencing litigation against FaZe Clan.  As the image below, taken from Tenney's Twitch stream on April 21 2019 shows,[6] Tenney was prominently featuring the FaZe Clan logo (the stylized Red "F") during his Twitch streaming.

---

[6] Tenney admitted at the deposition that this image was posted April 21, 2019, and that it features the FaZe Clan logo in the "overlay."  (SUF Response ¶ 49; Caixeiro Opp. Dec., Ex. A at 115:4-116:2.)



(SUF Response ¶ 49; Caixeiro Opp. Dec., Ex. C.)

As the image above indicates, the audience was making cash payments to Tenney through Twitch.  In this instance, an audience member known as "MrBeast" was donating (or had recently donated under the same circumstances) $124.00 to Tenney.  (SUF Response ¶ 49; *see* Caixeiro Opp. Dec., Ex. A at 116:14-117:22 ("Q. Well, isn't that a donation being made while you're playing that game, sir?  A. Yeah.").)  Moreover, in the text below the image, Tenney was simultaneously displaying and promoting his Epic Games code, "USE CODE "Tfue", which is the code that audience members used to ensure that Tfue would receive a portion of the purchase price for in-game merchandise they buy for the Fortnite game:

> Q.      And then down below it says "Use code Tfue in the item shop."  Do you see that?
> A.      Yes.
> Q.      And that's so you can get credit for in-game merchandise?
>          MR. FREEDMAN:  Objection.  Misstates the item.  You can answer.

16

> A.     If people purchase Fortnite skins in-game, then if they use my code, then I get five percent.
> A.     You get five percent of that in-game merchandise; correct?
> A.     Yeah, the in game skins.

(SUF Response ¶ 49; Caixeiro Opp. Dec., Ex. A at 118:16-119:5.)

Thus, as late as April 21, 2019, Tenney was using and displaying the FaZe Clan logo on his Twitch stream to promote his efforts to: (1) receive donations/direct payments from customers, and (2) increase the revenue he received from Epic Games in respect of in-game merchandise.  Tellingly, even as Tenney was publicly exploiting FaZe Clan's brand for his personal benefit, while simultaneously preparing his litigation position that the Gamer Agreement had supposedly expired months before, he did not express to his audience the view that he was no longer affiliated with FaZe Clan:

> Q.     Okay.  And at any point in time prior to April 1, 2019, did you announce to your subscribers, your followers that you were no longer affiliated with FaZe?
> A.     No.

(SUF Response ¶ 45; Caixeiro Opp. Dec., Ex. A at 117:23-118:3.)

## B.     Tenney's Limited Attacks on the Unjust Enrichment Claim Are Meritless

In the Motion, Tenney ignores the heart and substance of FaZe Clan's unjust enrichment claim.  He provides only two sentences of argument, does not cite to any evidence, and fails to discuss or analyze any elements of unjust enrichment.  (Tenney MSJ at 19.)  As such Tenney has failed to "point to a lack of evidence" on an "essential element" of the claim, as is his burden on summary judgment.  *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 417 (S.D.N.Y. 2012), op. clarified (Feb. 21, 2012) (citation omitted).  Thus, Tenney concedes that there are, at minimum, triable issues on the unjust enrichment claim unless he can confuse matters by injecting arguments relating to the California TAA.  (*See* Tenney MSJ at 19 (depicting unjust enrichment as an "end-run around the [California] TAA").)

17

Tenney's efforts to rely on the TAA to escape liability for unjust enrichment fail for several reasons. *First*, as set forth in greater detail in FaZe Clan's motion for summary judgment (*see* Doc. 47, at 10-13), the California TAA is inapplicable to the alleged conduct at issue because it occurred outside the geographic reach of California's TAA.

*Second*, there are, at minimum, triable issues relating to the TAA (*e.g.*, whether any "procurement" occurred within the ambit of that statute) that prevent Tenney from relying on the TAA to obtain a summary judgment on the unjust enrichment claim. Indeed, Tenney has not sought summary judgment on his TAA-related claims and defenses for this very reason. Tenney cannot use the existence of his TAA-related defenses to obtain summary judgment on FaZe Clan's unjust enrichment claim when he is not seeking summary judgment on those defenses.

*Third*, Tenney's argument is grounded in a fundamental misunderstanding of the California TAA; specifically, even if there is a TAA violation it does not automatically mean that a plaintiff cannot recover under a contract or in quasi-contract. *See Marathon Entm't, Inc.. v. Blasi*, 42 Cal. 4th 974 (2008); Cal. Civ. Code § 1599. Assuming, *arguendo*, that some of FaZe Clan's conduct violated the California TAA, the trier-of-fact must then consider whether and to what extent FaZe Clan can nevertheless be compensated for activities and benefits bestowed upon Tenney that did not violate the California TAA. See id.

The seminal case in this regard is *Marathon Entm't, Inc. v. Blasi*, 42 Cal. 4th 974 (2008). In *Marathon*, the California Supreme Court (California's highest appellate court) acknowledged the draconian results that can follow if an individual is forced to forfeit all of his or her compensation based on a single (and perhaps isolated) violation of the California TAA's licensing requirement. *Id.* at 990-99. To avoid these harsh forfeitures, *Marathon* held that, under the California TAA, courts were "empowered to void contracts in their entirety," but not

"obligated to do so," and could "apply equitable doctrines such as severance to achieve a more measured and appropriate remedy where the facts so warrant." *Id.* at 995. *Marathon* emphasized that the severance analysis is "fact specific" and requires a comprehensive, "case-by-case consideration" of various factors, including the percentage of the overall work that was not regulated by the TAA, and any other equitable considerations. *Id.* at 998.

Tenney's argument -- that an unjust enrichment theory of recovery is an improper "end-run around the TAA" (Tenney MSJ at 19) -- is grounded in a misreading of a 2005 decision, by an intermediate appellate court, which pre-dated *Marathon* by three years and dealt with a highly distinguishable fact pattern: *Yoo v. Robi,* 126 Cal. App. 4th 1089 (2005). (*See* Tenney MSJ at 19 (citing *Yoo*).) In *Yoo* the plaintiff, who was not licensed under the TAA, claimed he was a personal manager, not a TAA-regulated talent agent. *Yoo*, 126 Cal. App. 4th at 1094-95. But the trial court had found that the plaintiff's "principal and primary activities" on behalf of the defendant-artist were <u>all</u> in violation of the California TAA, and those findings were not challenged on appeal. *Id.* at 1100 n.13. Under these specific facts, the Court of Appeal declined to "sever" the non-TAA-compliant activities and denied the plaintiff any recovery, even for TAA-compliant work. *Id.* at 1103-04. In the course of that holding, the *Yoo* Court noted, in a footnote, that its "rationale [for denying recovery] is not limited to actions for breach of contract," but would apply equally "to actions seeking recovery on theories of unjust enrichment . . . " *Id.* at 1104 n.30.[7]

*Marathon* displaced, and resolved any ambiguity regarding the meaning of, *Yoo*.[8] *Marathon* clarifies that (1) the trier-of-fact is "fully empowered" but "not obligated" to sever any

---

[7] This is the *Yoo* footnote that Tenney quotes in his motion. (*See* Tenney MSJ at 19.)

[8] Some read the *Yoo* opinion narrowly, as an exercise of the Court's discretion to deny severance altogether when, as was the case in *Yoo*, the "principal and primary activities" all violated the

non-TAA-compliant activities and allow recovery for the TAA-compliant work; and (2) the

*Marathon* severance analysis is the same regardless of whether recovery is sought under a theory

of breach of contract, unjust enrichment, or both.  *See Yoo*, 126 Cal. App. 4th at 1104 n.30.

Tenney's argument ignores *Marathon* and the concept of severance, and instead asks this

Court to assume that any violation of the California TAA must mean that FaZe Clan cannot

recover in contract, quasi-contract or otherwise.  Tenney's argument is meritless, and certainly is

not a ground to support his requested summary judgment.

## III.   There Are Triable Issues of Fact that Preclude Summary Judgment on FaZe Clan's Tortious Interference Claims

Tenney wages two lines of attack against FaZe Clan's tortious interference claims with

its actual and potential brand deal partners.  (Tenney MSJ at 13-15.)  First, while Tenney does

not dispute the existence of FaZe Clan's contracts and business relationships, Tenney contends

that he was unaware of them.  (Tenney MSJ at 13.)  But this argument is belied by the record.

Tenney has admitted he was aware of FaZe Clan's contracts and relationships with at least

Digital Storm, Nissan, and Red Bull, along with others.  (SUF Response ¶ 53; Caixeiro Opp.

Dec., Ex. A at 193:11-14; 187:23-188:2.)  Moreover, even assuming, *arguendo*, Tenney was

unaware of the identity of a particular brand partner, he was aware of the existence of a class of

brand partners that FaZe Clan was negotiating with and/or had contracted with -- and a jury

could conclude his conduct was intended to disrupt those relationships and contracts.  (*Id.*; Trink

Dec. ¶ 16.)

---

TAA.  Others read the opinion more broadly, as an outright rejection that severance was *ever*
available under the California TAA.  *Id.* at 1105.  In *Marathon*, the California Supreme Court
cited and discussed *Yoo*, confirming that *Yoo*'s holding was narrow and limited to its facts; *i.e.,*
that *Yoo* did <u>not</u> "stand[] for the proposition that severance is never available under the [TAA]."
*Id.* at 992-93 n.12.

Second, Tenney claims there is a lack of evidence that Tenney induced the breach or non-performance of FaZe Clan's contracts and business relationships, but there are triable issues of fact that preclude summary judgment on this issue.  (Tenney MSJ at 13,15.)  For example, Faze Clan was negotiating with Digital Storm in and around August, 2018 to secure a sponsorship deal for the entire Fortnite team.  (SUF Response ¶ 54; Trink. Dec. ¶ 10.)  FaZe Clan lost the deal when Tenney went to Digital Storm himself to negotiate his own, separate sponsorship deal.  (*Id*.)  Such facts are sufficient to support a claim of intentional interference with contract.  *See Maison Lazard et Compagnie v. Manfra, Tordella & Brooks, Inc*., 585 F. Supp. 1286, 1291 (S.D.N.Y. 1984) tortious interference found where"[defendant] knew that a third party had the exclusive rights to sell outside the United States and that by its acts it would make it impossible for the third party to reap the full benefits of its contract.")

Additionally, FaZe Clan began negotiating a team-wide sponsorship deal with Wix.com Ltd ("Wix") in or around July, 2018.  (SUF Response ¶ 55; Trink. Dec. ¶ 11.)  Tenney agreed to participate in the Wix deal and took steps to begin performing his obligations.  (*Id*.)  But shortly before FaZe Clan publically announced its partnership with Wix in May, 2019 -- and around the time Tenney and his camp began a public smear campaign against FaZe Clan[9] -- Tenney abruptly refused to continue his participation in the deal, as promised.  (*Id.*)  This led to disruption and delay in the deal with Wix.  (*Id*.)

Tenney's conduct made the Wix deal impossible for FaZe Clan to perform in the manner promised, due to Tenney's withdrawal from the deal and simultaneous smear campaign.  *See*

---

[9] Tenney did more than simply announce he was leaving FaZe Clan.  Aside from breaching his obligations under contracts such as Wix and actively seeking his own deals with entities Tenney knew FaZe Clan had contracts and relationships with, Tenney publically disparaged FaZe Clan and made False accusations which made FaZe Clan's performance of its contracts impossible. (SUF ¶¶ 51-52; Trink Dec., ¶¶ 8-9.)

*Nat'l Football League Properties, Inc. v. Dallas Cowboys Football Club, Ltd.*, 922 F. Supp. 849, 856 (S.D.N.Y. 1996) (plaintiff sufficiently stated tortious interference claim based on allegations that defendant "interfered with and caused the violation and derogation of contractual rights granted by plaintiff to its licensees and sponsors" (internal citations omitted)).  Moreover, with respect to Digital Storm, as in *Nat'l Football League*, the defendant here committed tortious interference by sidestepping the plaintiff and making its own unilateral business arrangements.  (*Id.*; *see also Maison Lazard et Compagnie*, 585 F. Supp. at 1291 (S.D.N.Y. 1984))

Tenney's actions caused delays that lasted months for both Wix and Nissan.  That delay impacted FaZe Clan's future business with these entities during the following years, and contract renewals with value that would have exceeded the previous contracts.  (SUF Response ¶ 57; Trink Dec., ¶ 13.)  Tenney's interference with Digital Storm caused FaZe Clan to lose a deal for the entire Fortnite team and any future deals with the company.  (SUF Response ¶ 54; Trink Dec., ¶ 10.)

Other sponsors whose deals and relationships with FaZe Clan were impacted by Tenney include Nissan, Venmo, and Red Bull.  Those contracts and relationships involved similar circumstances as the Digital Storm and/or Wix deal, as discussed in greater detail in paragraphs 10 through 16 of the accompanying declaration of Lee Trink.  (SUF Response ¶¶ 53-59.)  Suffice it to say, there is at least enough evidence to support a jury verdict that Tenney was aware of FaZe Clan's contracts and business relationships, and his conduct served to intentionally sabotage those relationships.

/ / /

/ / /

/ / /

## **CONCLUSION**

For the reasons stated herein, FaZe Clan respectfully requests that the Court deny

Tenney's motion for partial summary judgment in its entirety.


Dated: Los Angeles, California                    By: */s/ Manny J. Caixeiro*
       March 19, 2020                              DENTONS US LLP
                                             Joel D. Siegel (admitted *pro hac vice*)
                                                (joel.siegel@dentons.com)
                                             Manny J. Caixeiro (Bar No. MC-0218)
                                                (manny.caixeiro@dentons.com)
                                            Paul M. Kakuske (admitted *pro hac vice*)
                                                (paul.kakuske@dentons.com)
                                             601 South Figueroa Street, Suite 2500
                                           Los Angeles, California 90017-5704
                                           (213) 623-9300

                                           Justin N. Kattan
                                                (justin.kattan@dentons.com)
                                           1221 Avenue of the Americas
                                           New York, New York 10020-1089

                                           *Attorneys for Plaintiff FaZe Clan Inc.*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this case. My business address is Suite 2500, 601 South Figueroa Street, Los Angeles, California 90017-5704.

A true and correct copy of the document, <u>PLAINTIFF FAZE CLAN INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TURNER TENNEY'S MOTION FOR PARTIAL SUMMARY JUDGMENT [PUBLIC VERSION]</u>, was served in the manner stated below.

**1. <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:** Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>March 19, 2020</u>, I checked the CM/ECF docket for this case and determined that the following person/s is/are on the Electronic Mail Notice List to receive NEF transmission at the email address/es stated below.

| | |
|---|---|
| Judd R. Spray | Counsel for Plaintiff |
| Law Office of J.R. Spray | T: 347 409 0211 / F: 212 244 4615 |
| 450 7th Avenue, 33rd Floor | E: juddspray@juddspraylaw.com; jspray@mselaw.com |
| New York, NY 10123-3300 | |
| | |
| Joshua D. Liston | Counsel for Defendant |
| Beys Liston & Mobargha LLP | T: 646 755 3600 / F: 646 755 3599 |
| 641 Lexington Avenue, 14th Floor | E: jliston@blmllp.com |
| New York, NY 10022-4503 | |

**2. <u>SERVED BY UNITED STATES MAIL &/~~OR~~ DIRECT EMAIL</u>:** On <u>March 19, 2020</u>, I or an attorney on the matter served the following person/s and/or entity/ies in this case at the last known address/es by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class postage prepaid, and addressed as follows, and/~~or~~ to the email address/es indicated. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

| | |
|---|---|
| Bryan J. Freedman | Counsel for Defendant |
| Freedman & Taitelman, LLP | T: 310 201 0005 / F: 310 201 0045 |
| 1901 Avenue of the Stars, Suite 500 | E: bfreedman@ftllp.com |
| Los Angeles, CA 90067-6007 | |

**3. <u>SERVED BY PERSONAL DELIVERY, NEXT BUSINESS DAY OR FACSIMILE TRANSMISSION</u>:** Pursuant to F.R.Civ.P. 5 and/or controlling Local Rules, on <u>March 19, 2020</u>, the following person/s and/or entity/ies was/were served by personal delivery, overnight mail service, or (for those who consented in writing to such service method) by facsimile transmission. Listing the judge here constitutes a declaration that personal or next court day delivery to the judge <u>will be completed</u> no later than the time indicated, if any.

| | |
|---|---|
| Honorable Jed S. Rakoff | ⮌ By Messenger to the Judge's Dropbox w/ NEF behind |
| Daniel Patrick Moynihan U.S. Courthouse | by 5pm the next court day |
| 500 Pearl Street, Courtroom 14B | ☐ By Next Business Day [Trkg# _____] |
| New York, NY 10007-1312 | ☐ By Facsimile to _____ |
| | ☐ By Email to RakoffNYSDChambers@nysd.uscourts.gov |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| March 19, 2020 | Frederick Kalve | *[signature]* |
| *Date* | *Printed Name* | *Signature* |

---

**PROOF OF SERVICE – Case No. 1:19-cv-07200-JSR**